UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| JAMES SAMUEL VARGO, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | 1:12-CV-248 |
| v. | ) | |
| | ) | Judge Curtis L. Collier |
| CITY OF CLEVELAND, TENNESSEE, | ) | |
| CLEVELAND POLICE DEPARTMENT, | ) | |
| OFFICER T. MCGUIRE, OFFICER S. WEST, | ) | |
| OFFICER B. TAYLOR, and M.C. UNION | ) | |
| RESTAURANTS, INC. D/B/A CATCH BAR | ) | |
| AND GRILL, | ) | |
| | ) | |
| *Defendants.* | ) | |

## M E M O R A N D U M

Before the Court are motions for summary judgment by Defendant Officers Brett Taylor,

Tyler McGuire, and Steve West (Court File No. 45); Defendant M.C. Union Restaurants, Inc.

("M.C. Union") (Court File No. 47); and Defendant City of Cleveland, Tennessee ("Cleveland")

(Court File No. 49). Defendants seek summary judgment on a variety of federal and state claims

arising out of Plaintiff James Samuel Vargo's ("Vargo") July 2011 arrest. For the following reasons,

the Court will **GRANT** M.C. Union's motion for summary judgment (Court File No. 47), **GRANT**

the City of Cleveland's motion for summary judgment (Court File No. 49), and **GRANT IN PART**

and **DENY IN PART** the individual officers' motion for summary judgment (Court File No. 45).

## I.    FACTUAL BACKGROUND

Around 6:00 p.m. on July 22, 2011 Vargo, his girlfriend Robin Sipe ("Sipe"), and Ed Oliver

("Oliver"), a friend, went to dine at Catch Bar and Grill ("the restaurant") in Cleveland, Tennessee.

The restaurant is owned by M.C. Union. Vargo and Sipe arrived in one car, Oliver in another.

Sarah Anderson ("Anderson") served the group that evening. No one in the dining party knew any

of the staff at the restaurant previous to that evening.

Over the course of about two hours, Vargo had a cognac and two or three rum and Coke mixed drinks, Sipe had two beers, and Oliver had a beer and a cognac (Court File No. 52-1, Vargo Dep., p. 111-112; Court File No. 52-2, Sipe Dep., pp. 15-16; Court File No. 52-4, Oliver Dep., p. 11). During the meal Vargo and Sipe made some complaints about the food, and adjustments were made to the bill. According to Anderson and Shari Lovsey ("Lovsey"), one of the restaurant managers working that night, over the course of the evening Vargo and Sipe became more and more disruptive and belligerent (Court File No 52-5, Anderson Dep., p. 18-20; Court File No. 52-3, Lovsey Dep., pp. 34-35). Both testified they believed Vargo and Sipe had become intoxicated by the end of the meal. Anderson noted "it wasn't their rude behavior" that led her to believe they were intoxicated but rather "[i]t was the later slurring of speech, the raising of voice to the point where we were -- I was uncomfortable" (Court File No. 52-5, Anderson Dep., p. 19). Lovsey explained that "it was past the point of the bad food complaint incident. I felt that maybe [Vargo and Sipe] were a little bit too far intoxicated, not totally drunk but intoxicated enough that I wanted them to have a safe ride home, and not be behind the wheel" (Court File No. 52-3, Lovsey Dep., pp. 45-46). Vargo, on the other hand, testified he never raised his voice or became loud in the restaurant, and Oliver testified Vargo was "very calm, very polite" (Court File No. 52-1, Vargo Dep., p. 121; Court File No. 52-4, Oliver Dep., p. 16).

Restaurant staff eventually determined the group had become too disruptive to stay. Around 8:00 p.m. Lovsey told the group, "I'm going to have to ask you to leave, will you please let me call you a cab, or I'm going to have to call the police" (Court File No. 52-3, Lovsey Dep., p. 46). Vargo and Sipe acknowledged in deposition that they were offered a cab. Instead of taking the offer,

however, they left the restaurant. As the group was leaving the other manager, Casey Blaylock, called the police and reported that an intoxicated man had refused a cab and was attempting to drive. He based this assessment on information relayed to him by Anderson and Lovsey. And based on his experience in the restaurant industry and his understanding of state law, Blaylock determined the proper course of action was to call law enforcement to alert them to the possibility of an intoxicated driver (Court File No. 52-6, Blaylock Dep., pp. 13-14).

Oliver, who restaurant staff did not think was intoxicated, left the scene alone. Vargo and Sipe went out and sat in Vargo's car. Vargo admits he was in the driver's seat with the engine running when the defendant officers approached the car. Officer Taylor saw Vargo sit a beer can on the rear seat as the officer approached. Vargo does not deny the beer can was there. According to Officer Taylor, despite his numerous orders for Vargo to stay seated while the officers investigated, Vargo got out of the car. Officer Taylor determined Vargo was intoxicated after observing his "speech was slurred[,] he smelled of alcohol[,] his eyes were glassy and bloodshot[, and] he was also using the door of his car to prop -- to keep his balance" (Court File No. 52-7, Taylor Dep., p. 127). Officer Taylor testified after Vargo continued to be "belligerent" and refuse to comply with orders, he told Vargo he was under arrest (*id.* at 124). According to Officer Taylor, upon being told he was under arrest Vargo sat back down in the car and refused Officer Taylor's order to stand up (*id.* at 132). Officer Taylor testified how the scene then unfolded:

> I told him to get out of the vehicle, that he was under arrest. He sat there. I reached in to bring him out of the car. As I grabbed his arm, he acted like he was going to go ahead and get out of the car. I didn't pull, tug, or anything on him. He went to get out of the car. He knelt down on the ground, fell to the ground. We told him to -- he started rolling around, making a scene. We knelt down, told him to stop resisting, grabbed his arms. He was making a scene. We arrested him or handcuffed him, and he was placed in the back of the patrol car.

3

(*id.* at 124-5). Officer West confirmed this account, testifying that at first Vargo refused to sit down in the car and then, after being told by Officer Taylor he was under arrest, sat back down and would not get up. Officer West explained after Vargo refused to get up, "Officer Taylor reached for him to remove him from his car, there was no pulling him to remove him from the car. He basically got out of the car and he just kind of threw himself on the ground" (Court File No. 52-8, West Dep., p. 17). Officer West further testified he did not "know if [Vargo] fell or if he threw himself on the ground, but he started thrashing on the ground," at which point Officer Taylor cuffed him (*id*). Officer West continued: "[T]here was no real struggle once he put his hands on him and cuffed him. It wasn't a matter of great difficulty, but he did refuse to get out of the car once he was told he was under arrest" (*id*. at 18).

Officer McGuire testified he did not see Officer Taylor help remove Vargo from the car, noting that it appeared Vargo "had fallen down or sat down or something . . . and he was flopping around on the ground" (Court File No. 45-2, McGuire Dep., p. 41). Officer McGuire testified he was not sure but he "possibly could have helped handcuff [Vargo]" (Court File No. 52-9, McGuire Dep., p. 53). Lovsey testified she heard two officers ordering Vargo to get out of his car, but "[h]e wouldn't get out[,] so at that time they pulled him out of the vehicle and arrested him." (Court File No. 45-4, Lovsey Dep., p. 65). She said the officers "were very patient," giving Vargo numerous opportunities to get out of the car (*id*.). She also testified that she did not recall any officer slam Vargo on the ground or hit or kick him (*id*.).

Vargo and Sipe tell a different version of events. Vargo testified his balance was fine and he was not slurring his speech or otherwise appeared intoxicated, although he admitted he smelled like alcohol because of the cognac (Court File No. 48-4, Vargo Dep., 120 ). He noted if someone

4

smelled his breath the person might have thought him intoxicated (*id.* at p. 191). Vargo testified the officers approached him while he was in his car and "in a loud voice were screaming" at him and giving him mixed commands (*id.* at 131). One was saying to stay seated and another to get out of the car (*id.*). He testified it took about a minute or a minute and a half from the time the officers approached the car until he "was grabbed[,] jerked out of the car, spun around, and slammed to the ground," hitting his head on the door frame on the way out (*id.* at 133-34, 138). Vargo said he does not remember being told he was under arrest until he was face down on the ground (*id.* at 134). Vargo testified once face down on the ground, two officers were on his back: "one of them has their knee across my upper back, shoulder blades, close to my neck, holding my head down to the asphalt, screaming at me to stop resisting. . . . And there was someone else on my lower back, I believe, swinging my arms around to handcuff me" (*id.* at 137).

As he was being "spun around, manhandled, thrown to the ground, [and] flipped over to my stomach," Vargo testified, "my girlfriend was screaming at them and telling them that I had a bad back and neck, and it just didn't matter. I just was, bam" (*id.* at 138-39). Vargo testified he also told the officers about his bad back and neck after he was face down on the ground but they continued to apply pressure. Sipe testified that while an officer was grabbing Vargo, she "screamed out loud what are you doing, he has a bad back and neck" (Court File No. 48-8, Sipe Dep., p. 22). As she explained, "I heard a thump, so I knew he had hit his head as they jerked him out" and "[t]here were two younger cops on him after they slammed him to the ground" (id. at 23). Vargo testified the incident left him with a "slight abrasion" on his face (*id.* at 142). He did not ask for medical attention at the scene or in the police car on the way to the station (*id.* at 144).

The officers did not take witness statements from anyone at the scene, including restaurant

5

staff. Nor was a breathalyzer or field sobriety test administered. Vargo was charged with public intoxication, disorderly conduct, and resisting arrest. After pleading not guilty, the charges were dismissed on the condition that Defendant pay court costs on the public intoxication charge.

Vargo filed the instant 42 U.S.C. § 1983 action alleging claims under the Fourth, Fifth, Eight, and Fourteenth Amendments against the officers and Cleveland; state law claims for false imprisonment, assault, conspiracy to slander and libel, negligence, and conversion against the officers and Cleveland; and state law claims for malicious harassment and malicious prosecution against M.C. Union. The defendants moved to dismiss a number of the claims. For the reasons articulated in the Court's previous Memorandum addressing the motions to dismiss, the Court dismissed the Fifth, Eighth, and Fourteen Amendment claims (Court File No. 41). Subsequently, the individual officer defendants, M.C. Union, and Cleveland filed motions for summary judgment on the remaining claims (Court File Nos. 45, 47, and 49, respectively). Vargo responded to the motions in one brief (Court File No. 52), and the defendants filed separate replies (Court File Nos. 52, 53, and 54). The motions for summary judgment are now ripe for disposition.

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

6

However, the non-movant is not entitled to a trial based merely on its allegations; it must submit significant probative evidence to support its claims. *See Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should enter summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. DISCUSSION

### A. Federal Claims

To state a general claim under 42 U.S.C. § 1983, a plaintiff must "demonstrate that a person acting under color of state law 'deprived [him] of rights, privileges or immunities secured by the Constitution or laws of the United States.'" *Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011) (citing *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)). It is undisputed that the officers were acting under color of state law; thus the question is whether a deprivation of rights occurred. Vargo alleges two Fourth Amendment violations: false arrest and excessive force. If either or both asserted deprivations survive summary judgment, then the Court must determine whether the officers are entitled to qualified immunity and whether Cleveland may be held liable pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).

7

### 1. False Arrest

Vargo claims the officers violated the Fourth Amendment by arresting him without probable cause. "A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (quoting *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005)). "Under § 1983, probable cause to justify an arrest means facts and circumstances within the official's knowledge that are sufficient to warrant a prudent person in believing, in the circumstances shown, that the suspect has committed or is about to commit an offense." *Drake v. Vill. of Johnstown, Ohio*, 534 F. App'x 431, 439 (6th Cir. 2013). "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Lapsins*, 570 F.3d 758, 764 (6th Cir. 2009) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 n. 13 (1983)).

The defendant officers argue there was probable cause to believe Vargo was committing the offense of public intoxication and driving under the influence ("DUI"). Public intoxication in Tennessee requires that a person be under the influence of an intoxicating substance "to such a degree that: (1) The offender may be endangered; (2) There is endangerment to other persons or property; or (3) The offender unreasonably annoys people in the vicinity." Tenn. Code Ann. § 39-17-310. Simply being intoxicated is insufficient. In *Diamond v. Howd*, for instance, the Sixth Circuit noted that although a plaintiff's "behavior was characteristic of a state of inebriation, it does not compel a determination that [the officer] had reasonable trustworthy information sufficient to warrant a belief that [the plaintiff] presented a danger to herself, presented a danger to others, or was annoying others." 288 F.3d 932, 937 (6th Cir. 2002); *see also Bettis v. Pearson*, No. 1:04-CV-112,

2007 WL 2426404 (E.D. Tenn. Aug. 21, 2007) (explaining that although the defendant officer asserted the plaintiff's "speech was slightly slurred and he ha[d] a strong odor of intoxicant about his person," which would be indicative of intoxication, "it does not necessarily lead to the conclusion that Plaintiff was endangering himself, others, or property, or unreasonably annoying others") (internal quotation marks and citations omitted).

Tennessee's DUI statute states that,

It is unlawful for any person to drive *or to be in physical control of any automobile* or other motor driven vehicle on any of the public roads and highways of the state, any shopping center, trailer park, apartment house complex or any other location which is generally frequented by the public at large, while:

(1) Under the influence of any intoxicant, marijuana, controlled substance, controlled substance analogue, drug, substance affecting the central nervous system or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of himself which he would otherwise possess;

(2) The alcohol concentration in the person's blood or breath is eight-hundredths of one percent (0.08%) or more;

Tenn. Code Ann. § 55-10-401(emphasis added). In applying this statute, "courts must follow 'the totality of the circumstances approach in assessing the accused's physical control of an automobile.'" *State v. Rogers*, No. E2013-01356-CCA-R3CD, 2014 WL 1327649, at *5 (Tenn. Crim. App. Apr. 2, 2014) (quoting *State v. Lawrence*, 849 S.W.2d 761, 765 (Tenn.1993)). Courts have construed "physical control" broadly. One case notes that "[t]he vehicle's engine need not be running, and the vehicle need not be actually moving at the time." *State v. Barham*, No. W2011-02348-CCA-R3CD, 2012 WL 4057246, at *4 (Tenn. Crim. App. Sept. 17, 2012). In another, the Tennessee Supreme determined a defendant was in physical control of a vehicle when an officer found him asleep in a truck with the engine off and the keys in the defendant's pocket.

9

*Lawrence*, 849 S.W.2d at 765. As the court explained, "[i]t is our opinion that the Legislature, in making it a crime to be in physical control of an automobile while under the influence of an intoxicant, intended to enable the drunken driver to be apprehended before he strikes." *Id.* (internal quotation marks omitted).

Here, Vargo does not dispute that the defendant officers received a call from dispatch reporting there was a likely intoxicated man getting ready to drive away from the restaurant. Vargo admits that when the officers walked up to the car Vargo was in the driver's seat and the engine was on. He further admits Officer Taylor saw an open beer can sitting on the back seat. He also acknowledges that someone smelling his breath could conclude he was intoxicated. The Court concludes that, under these undisputed facts, no reasonable jury could find there was insufficient reason to believe Vargo was intoxicated and in physical control of the automobile in a place frequented by the public. Accordingly, such information was "sufficient to warrant a prudent person in believing, in the circumstances shown, that the suspect has committed or is about to commit [the] offense" of DUI. *Drake*, 534 F. App'x at 439.

For similar reasons, there was also probable cause to arrest Vargo for public intoxication. The facts possessed by the officers indicated Vargo was likely intoxicated to a degree that endangered himself and others, as he was in physical control of a vehicle in a public place and appeared to be getting ready to drive away. Vargo argues the public intoxication arrest was impermissibly based solely on the report from Blaylock. Vargo is correct that ordinarily "a bare allegation of criminal wrongdoing, although possibly justifying a brief investigatory detention, [is] insufficient by itself to establish probable cause that the suspect had committed a crime." *Parsons v. City of Pontiac*, 533 F.3d 492, 500-01 (6th Cir. 2008). However, in addition to receiving the

10

information from dispatch regarding a possible intoxicated driver, the officers in this case corroborated the information when they found Vargo, smelling of alcohol, sitting in the driver's seat of the car with the engine turned on and an open beer can in the back seat.

Vargo contends that even this was insufficient because the officers did not talk to the restaurant workers or administer a breathalyzer. Probable cause for arrest, however, does not mean investigating officers must lift every stone. Rather, "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Lapsins*, 570 F.3d at 764 (quoting *Gates*, 462 U.S. at 236 n. 13). As explained above, the undisputed facts demonstrate there was "a probability or substantial chance" that both public intoxication and DUI had been committed.[1] Accordingly, the Court will grant summary judgment on the false arrest claim against the officers in their individual capacities. As a consequence, the Court will also grant summary judgment for Cleveland on the derivative *Monell* claim, as Vargo cannot prevail on such a claim without showing that an underlying constitutional violation took place. *See Hancock v. Dodson*, 958 F.2d 1367, 1376 (6th Cir. 1992) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989)).

### 2. Excessive Force

#### a. Individual Officers

The defendant officers claim they are also entitled to summary judgment on the excessive force claim. In order to bring a successful claim of excessive force Plaintiffs must "demonstrate that

---

[1] That charges were not lodged or later dropped is of no moment, as "[t]he validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).

a seizure occurred, and that the force used in effecting the seizure was objectively unreasonable." *Rodriguez v. Passinault*, 637 F.3d 675, 680 (6th Cir. 2011). The Court must view the "facts and circumstances of the case" from the "perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 395-96 (1989)). Indeed, "an officer making an . . . arrest has the right to use some degree of physical coercion or threat thereof to effect it." *Id.* (internal citations omitted). In other words, the Court must determine whether the officer's use of force was "objectively reasonable" under the "totality of the circumstances." *Id.* at 236-37. To make such determination, the Court considers "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *see also Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010) (citing *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)). This is not an "exhaustive list," and the inquiry ultimately turns on whether the seizure was reasonable under the "totality of the circumstances." *Slusher v. Carson*, 540 F.3d 449, 455 (6th Cir. 2008).

The officers' version of events would not support a claim of excessive force. Officers Taylor and West testified Vargo refused to get out of the car after being told he was under arrest despite numerous orders to do so. They also testified that although Officer Taylor touched Vargo, he did not pull him from the car and throw him on the ground. Rather, they said Vargo either fell or threw himself on the ground and then thrashed about, at which point officers knelt down, told him to stop resisting, and handcuffed him. Such force would clearly have been reasonable under the totality of the circumstances.

Vargo and Sipe, however, testified that without warning or provocation Officer Taylor

grabbed Vargo and jerked him out of the car, causing his head to bang against the door frame, and was then slammed onto the asphalt. They said two of the officers knelt on Vargo's lower back and shoulder blade areas while Sipe and Vargo pleaded with them to be mindful of Vargo's bad back and neck. They testify Vargo never resisted. Viewing the evidence in the light most favorable to Vargo, the non-moving party, this testimony presents a question of material fact as to whether an unreasonable amount of force was used, particularly in light of the severity of the crime at issue, the undisputed fact that Vargo did not appear to pose an immediate threat, and the possibility that Vargo did not actively resist arrest.[2]

### b. Qualified Immunity

The officers claim that even if they used excessive force, summary judgment is proper because qualified immunity applies. The qualified immunity doctrine shields government officials performing discretionary actions from civil damages liability as long as their actions reasonably could have been thought consistent with the rights they are alleged to have violated. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Even if a government official deprives a plaintiff of a federal right, "qualified immunity will apply if an objective reasonable officer would not have understood, by referencing clearly established law, that his conduct was unlawful." *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The plaintiff bears the burden of showing a defendant is not entitled to qualified immunity. *See Wegener v. City of*

---

[2] Merely staying put in a vehicle is ordinarily not considered active resistance, as "noncompliance alone does not indicate active resistance." *Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013). *Eldridge* quotes *Coles v. Eagle*, 704 F.3d 624, 629–30 (9th Cir. 2012), for the proposition that "failing to exit a vehicle is not active resistance." *Id.* If the person is not physically resisting, something more—such as a "verbal showing of hostility"—is required. *Id.*

13

*Covington*, 933 F.2d 390, 392 (6th Cir. 1991).

To determine if qualified immunity applies, courts employ a two-part test. First, courts determine whether the facts, taken in a light most favorable to the party alleging injury, show an officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, if a Constitutional right was violated, courts must determine "whether the violation involved a clearly established constitutional right of which a reasonable person would have known." *Peete v. Metro. Gov't of Nashville and Davidson Cnty.*, 486 F.3d 217, 219 (6th Cir. 2007) (citation omitted); *see also Saucier*, 533 U.S. at 201.[3] This second inquiry looks closely at the particular context of the case rather than asking whether a right was clearly established "as a broad general proposition." *Saucier*, 533 U.S. at 201. If a plaintiff fails to establish either of these prongs, he has failed to carry his burden and judgment is appropriate for the defendant. *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

The Court already concluded Vargo has presented a question of material fact regarding the use of excessive force. The Court must therefore consider whether the violation involved a clearly established right of which a reasonable officer would have known. "Cases in this circuit clearly establish the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest." *Shreve v. Jessamine Cnty. Fiscal Court*, 453 F.3d 681, 688 (6th Cir. 2006) (noting such a right was clearly established in 1991); *see also Griffith v. Coburn*, 473 F.3d 650, 659-60 (6th Cir. 2007) (noting suspects have a "clearly established constitutional right to be free from gratuitous

---

[3] In *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Supreme Court held that, although first considering whether a constitutional violation has been shown is often beneficial, a court may consider the second prong of the inquiry first in appropriate cases. In this case, however, the Court has considered the inquiries in normal order.

14

violence during arrest . . . ."); *St. John v. Hickey*, 411 F.3d 762, 774 (6th Cir. 2005) ("[T]he right of a nonviolent arrestee to be free from unnecessary pain knowingly inflicted during an arrest was clearly established.").

In light of the above authority, it was clearly established at the time of Vargo's arrest that it would constitute excessive force to jerk a non-resisting suspect from a vehicle, throw him to the ground, and have two officers kneel on his back. Such behavior would constitute gratuitous violence against a suspect during the commission of an arrest. Accordingly, because the Court cannot grant the officers qualified immunity, it will deny summary judgment to the individual officers on the excessive force claim.

### c. City of Cleveland

Cleveland argues Vargo has not pointed to evidence showing it may be held liable if indeed the officers used excessive force. A § 1983 suit against a municipality involves a two-prong inquiry. *Cash v. Hamilton Cnty. Dep't of Adult Prob.,* 388 F.3d 539, 542 (6th Cir. 2004). The court must determine (1) whether the plaintiff has been deprived of a constitutional right and (2) whether the municipality is responsible for the violation. *Id.* When a party brings a suit for damages against an officer in his official capacity, it is construed as a suit against the governmental entity.[4] *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).

A municipality cannot be liable under a *respondeat superior* theory for § 1983 violations. *Spears v. Ruth*, 589 F.3d 249, 256 n.6 (6th Cir. 2009) (citing *Monell*, 436 U.S. at 691). Rather,

---

[4] Accordingly, because the City of Cleveland is already a defendant in this suit, the claims against the officers in their official capacities are dismissed as redundant.

15

municipalities are liable when they "have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Cash*, 388 F.3d at 542 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). A § 1983 plaintiff can draw from one of four sources to establish a municipality's liability for an illegal custom or policy: "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Spears*, 589 F.3d at 256 (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir.2005)). A plaintiff bears the burden of showing "that the unconstitutional policy or custom existed, that the policy or custom was connected to the [municipality], and that the policy or custom caused [the] constitutional violation." *Napier v. Madison Cnty.*, 238 F.3d 739, 743 (6th Cir. 2001).

Failure to adequately train or supervise officers can rise to the level of a *de facto* unconstitutional policy or custom if a plaintiff can show: "(1) the training or supervision was inadequate to the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Board of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Loggins v. Franklin Cnty.*, 218 F. App'x 466, 473 (6th Cir. 2007) (quotation omitted).

16

Vargo's complaint alleges Cleveland failed to properly train or supervise its officers in the use of force and adopted policies tolerating the abuse of suspects. Cleveland's summary judgment points to evidence detailing the training and supervisory procedures put in place related to the use of excessive force. Vargo's response brief, on the other hand, points to no facts whatsoever regarding Cleveland's alleged failure to train regarding the use of force or any municipal policy that tolerated the excessive use of force. When faced with a motion for summary judgment, the non-movant is not entitled to a trial based merely on its allegations. Rather, it must submit significant probative evidence to support its claims. *See Celotex*, 477 U.S. at 324; *McLean*, 224 F.3d at 800. Because Vargo failed to provide any evidence to support municipal liability relating to excessive force, the Court will grant summary judgment in Cleveland's favor on this claim.

### B. State Law Claims

#### 1. City of Cleveland

Cleveland moves for summary judgment on the state law claims of false imprisonment, assault, conspiracy to slander and libel, negligence, negligent supervision, and conversion on the basis that the Tennessee Governmental Tort Liability Act ("TGTLA") has not waived immunity for the claims in the context of this case. In his response brief Vargo essentially concedes that Cleveland is immune from suit on these claims (Court File No. 52, pp. 19-20). He is correct to do so. The TGTLA waives governmental immunity for certain, specified causes of action, including some negligence claims. *See* Tenn. Code Ann. § 29-20-205. The removal of governmental immunity, however, does not apply to a number of claims, including those arising out a civil rights violation. *See* Tenn. Code Ann. § 29-20-205(2) (retaining governmental immunity when the injury arises out of "false arrest, . . . libel, slander, . . . or civil rights"); *Campbell*, 695 F. Supp. 2d at 778

(holding governmental immunity for, *inter alia*, battery, intentional infliction of emotional distress, and negligence claims was not waived because the claims were "predicated on the alleged violation of [plaintiff's] civil rights by [an officer]"); *Johnson v. City of Memphis*, 617 F.3d 864, 872 (6th Cir. 2010) (favorably citing *Campbell* and holding that because the plaintiff's negligence claim "arises out of the same circumstances giving rise to her civil rights claim under § 1983," the claim "falls within the exception listed in § 29-20-205, and the City retains its immunity"). Accordingly, because all of the state law claims against Cleveland are either specifically enumerated as exempt from TGTLA's waiver of municipal immunity, or fall under the "civil rights" exemption because they were committed in the context of a civil rights violation, the Court will grant Cleveland summary judgment on all of Vargo's state law claims.

### 2. Individual Officers

#### a. Assault

In their summary judgment motion, the defendant officers assert that the TGTLA waives municipal immunity for assault, which would mean the officers gain immunity. *See* Tenn. Code Ann. § 29-20-310(b) ("No claim may be brought against an employee or judgment entered against an employee for damages for which the immunity of the governmental entity is removed by this chapter . . . ."). However, as explained above, because the alleged assault arose in the context of a civil rights claim, Cleveland retains immunity from suit on the assault claim. Accordingly, § 29-20-310(b)'s bar against suing individuals does not apply; thus the officers are not immune from suit in their individual capacities.

The officers offer no additional ground for why the Court should grant summary judgment on the assault claim. "A party seeking summary judgment always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp*, 477 U.S. at 323; *see also Leary*, 349 F.3d at 897. Thus, because the officers, as the moving parties, have failed to meet their burden of demonstrating no genuine issue of material fact exists, the Court will deny summary judgment on the assault claim.

### b. False Imprisonment

The defendant officers argue they are immune from suit on the false imprisonment claim pursuant to Tenn. Code Ann. § 29-20-310(b) because immunity for Cleveland has been removed. As explained above, however, because the alleged false imprisonment arose in the context of a civil rights claim, Cleveland retains immunity from suit on the false imprisonment claim. Accordingly, § 29-20-310(b)'s bar against suing individuals does not apply.

False imprisonment requires a plaintiff to prove (1) he was restrained or detained against his will by a defendant and (2) the restraint or detention was unlawful. *Bryant-Bruce v. Vanderbilt Univ., Inc.*, 974 F. Supp. 1127, 1145 (M.D. Tenn. 1997); *Coffee v. Peterbilt of Nashville, Inc.*, 795 S.W.2d 656, 659 (Tenn. 1990). This intentional restraint must be without just cause. *B.M.D.* ex rel. *Dickerson v. Knox Cnty.*, No. 3:07-CV-73, 2009 WL 677776, at *13 (E.D. Tenn. Mar. 10, 2009) (citing *Newsom v. Thalhimer Bros., Inc.*, 901 S.W.2d 365, 367 (Tenn. Ct. App. 1995)); *see also Bryant-Bruce*, 974 F. Supp. at 1145 ("Under Tennessee law, false imprisonment is the intentional restraint or detention of another without just cause.") (citing *Newsom*, 901 S.W.2d at 367).

The officers argue because the detention was pursuant to an arrest with probable cause, Vargo cannot satisfy the second element of false imprisonment. The Court agrees. As explained

above, there is no question of material fact as to whether the officers had probable cause to arrest and detain Vargo. Because the detention was not unlawful, the Court will grant the defendant officers summary judgment on the false imprisonment claim.

### c. Negligence

The defendant officers assert they are immune from suit on the negligence claim pursuant to Tenn. Code Ann. § 29-20-310(b) because immunity for Cleveland has been removed. As the Court explained above, however, because the alleged negligence arose in the context of a civil rights claim, Cleveland retains immunity from suit on the negligence claim. Thus § 29-20-310(b)'s bar against suing individuals does not apply. A plaintiff may not, however, maintain a negligence claim when it is actually rooted in alleged intentional tortious conduct. As this Court noted in a previous § 1983 case involving similar issues, "[a]n allegation of excessive force makes a claim for battery or assault, but does not make out a claim for negligence." *Evans v. City of Etowah*, No. 1:06-CV-252, 2008 WL 918515, at *10 (E.D. Tenn. Apr. 3, 2008) (citing *City of Mason v. Banks*, 581 S.W.2d 621, 626 (Tenn.1979)) aff'd in 312 F. App'x 767 (6th Cir. 2009). The Court explained that a negligence claim could not survive summary judgment because the "[p]laintiff does not point anywhere in the record to any evidence of any particular act of negligence unrelated to the intentional torts of the police officers, specifically malicious prosecution, false arrest, assault and battery." *Evans*, No. 1:06-CV-252, 2008 WL 918515, at *10 (citing Restatement (Second) of Torts § 282 Comment d, which provides that "[t]he definition of negligence . . . includes only such conduct as creates liability for the reason that it involves *a risk and not a certainty* of invading the interest of another.") (emphasis added).

In the instant case, neither the complaint nor Vargo's response to the motion for summary

judgment articulate a negligence claim.  Rather, Vargo dresses up his constitutional claims in the language of negligence, arguing the defendant officers "owed a duty of reasonable care to Plaintiff to refrain from violating Plaintiff's constitutional right to be free from unlawful arrest and to avoid using excessive force to effectuate that unlawful arrest," and the officers violated that duty "[b]y arresting Plaintiff without probable cause and using excessive force to effectuate that arrest" (Court File No. 52, p. 22).  Because Vargo does not point to specific negligent behavior separate from the intentional tortious conduct alleged, the Court will grant summary judgment on this claim for the officer defendants.

### d.  Conspiracy to libel and slander

Vargo's complaint alleges the defendant officers "participated in a common design through a concert of action to protect their fellow officers by making overtly false statement in their reports to the court in a public document regarding the circumstances surrounding [Vargo's arrest]" (Court File No. 1, p. 14).  The officers raise a number of grounds for summary judgment on this issue, including the six-month statute of limitations for slander and that Vargo has not shown what was published or Vargo's reputation was harmed.  Vargo's response brief does not discuss  conspiracy, libel, or slander at all, never mind point to evidence in the record supporting a claim. The officers have met their burden of demonstrating no genuine issue of material fact exists by pointing out Vargo's failure to put forth any evidence supporting his claim.  Accordingly, the Court will grant the officer defendants summary judgment on this claim.

### e.  Conversion

The defendant officers argue they are entitled to summary judgment on the conversion claim because Vargo has put forth no evidence to support it.  Vargo's response brief mimics the elements

of conversion, couching them in the general context of this case: "[The officers] intended to exercise dominion and control over Plaintiff's sunglasses in defiance of Plaintiff's rights when they arrested him. Defendants appropriated Plaintiff's sunglasses to their own use and benefit by confiscating Plaintiff's sunglasses during his arrest and failing or refusing to return such sunglasses to Plaintiff upon his release from custody" (Court File No. 52, p. 24). Vargo does not, however, point to anything in the record related to the sunglasses. As noted above, Vargo is not entitled to a trial based merely on his allegations; he must submit significant probative evidence to support his claims. *See Celotex*, 477 U.S. at 324. Because Vargo points to no evidence relating to the sunglasses, the Court will grant summary judgment on the conversion claim.

### 3. M.C. Union

#### a. Malicious Harassment

Tenn. Code Ann. § 4-21-701 provides a civil cause of action for malicious harassment. The elements of the offense are derived from the crime of civil rights intimidation under Tenn. Code Ann. § 39-17-309. *Washington v. Robertson Cnty.*, 29 S.W.3d 466, 468 (Tenn. 2000). Section 39-17-309 states that it is intended to protect "the right of every person regardless of race, color, ancestry, religion or national origin, to be secure and protected from fear, intimidation, harassment and bodily injury caused by the activities of groups and individuals." As malicious harassment under § 4-21-701 derives its elements from § 39-17-309, it too requires a defendant's conduct be motivated by the plaintiff's "race, color, ancestry, religion, or national origin." *Levy v. Franks*, 159 S.W.3d 66, 81 (Tenn. Ct. App. 2004); *Oates v. Chattanooga Pub. Co.*, 205 S.W.3d 418, 428 (Tenn. Ct. App. 2006); *Bowman v. City of Memphis*, 329 S.W.3d 766, 768 (Tenn. Ct. App. 2010).

M.C. Union points out Vargo never alleged that any of M.C. Union's employee's conduct

22

toward him was based on his race, color, ancestry, religion, or national origin. As with other of Vargo's claims, Vargo did not respond to this in his response brief. Accordingly, Vargo having not pointed to any evidence in the record to support a claim of malicious harassment, the Court will grant summary judgment to M.C. Union on this claim.

### b. Malicious Prosecution

To establish the elements of malicious prosecution, a plaintiff must prove that (1) the defendant had initiated a prior suit or judicial proceeding without probable cause, (2) the defendant brought such prior action with malice, and (3) the prior action was finally terminated in plaintiff's favor. *Himmelfarb v. Allain*, 380 S.W.3d 35, 38 (Tenn. 2012) (citing *Christian v. Lapidus*, 833 S.W.2d 71, 73 (Tenn. 1992)). The defendant need not have actually filed a complaint against the plaintiff. Rather, "[o]ne who causes another's prosecution by *false statements or misrepresentations, made to a police officer, with an improper motive*, is liable for malicious prosecution, although he does not file a complaint or actually procure the prosecution." *Davis v. Tennessee Wildlife Res. Agency*, No. W2005-00406-COA-R3CV, 2006 WL 861352, at *6-7 (Tenn. Ct. App. Apr. 5, 2006) (quoting *Cohen v. Ferguson*, 336 S.W.2d 949, 954 (Tenn. Ct. App. 1959)). But if the defendant merely discloses facts in good faith to the officer, leaving the officer to act on his or her independent judgment, the defendant cannot be liable. *Id.*

M.C. Union argues Vargo has provided no evidence to show Blaylock, with malice, made misrepresentations about Vargo when he called the police. Vargo simply asserts the restaurant employees had ill will toward Vargo because of his and Sipe's complaints about the food; thus Anderson and Lovsey misrepresented to Blaylock who misrepresented to the police dispatcher. But the undisputed fact that Vargo and Sipe were offered a cab belies the existence of any malice, never

23

mind misrepresentation. The evidence shows the restaurant staff were concerned Vargo would take to the road intoxicated. If they were out to "get" Vargo, why then offer to call him a taxi cab? No rational jury could conclude that Blaylock made a false statement to the police or did so out of malice. Because a fair-minded jury could not return a verdict in favor of Vargo on the malicious prosecution charge based on the record, the Court will enter summary judgment for M.C. Union. *Anderson*, 477 U.S. at 251-52.

## IV.     CONCLUSION

For the foregoing reasons, the Court will **GRANT** M.C. Union's motion for summary judgment (Court File No. 47), **GRANT** the City of Cleveland's motion for summary judgment (Court File No. 49), and **GRANT IN PART** and **DENY IN PART** the individual officers' motion for summary judgment (Court File No. 45). This case will proceed on Vargo's claims against the defendant officers, in their individual capacities, for excessive force under federal law and assault under state law.

**An order shall enter.**

/s/ _____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**